IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ANGELA LYONS,                                 :

      Plaintiff,

  v.                                          :      Case No. 3:14-cv-21

PATRICK R. DONAHOE,                                  JUDGE WALTER H. RICE
Postmaster General, United States
Postal Service,                               :

      Defendant.

---

DECISION AND ENTRY SUSTAINING DEFENDANT PATRICK R.
DONAHOE'S RENEWED MOTION FOR SUMMARY JUDGMENT (DOC.
#35); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND
AGAINST PLAINTIFF; TERMINATION ENTRY

---

Plaintiff Angela Lyons ("Plaintiff") alleges that she was subject to

retaliation and race and disability-based discrimination for protected behavior on four

occasions between April 18, and May 27, 2011, while she was employed by the United

States Postal Service ("USPS") as a T-7 clerk.  She alleges that this discrimination

(Counts I and II) and retaliation (Count V) was effected by employees of Patrick R.

Donahoe ("Donahoe")[1], Postmaster General of the United States ("Defendant").  Plaintiff

claims Defendant's actions violated her rights under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Rehabilitation Act of 1973, 29

---

[1] On February 15, 2015, after the instant lawsuit was filed, Megan J. Brennan succeeded Donahoe as
Postmaster General.  However, in an effort to avoid confusion, and because the identity of the
Postmaster General does not affect the outcome of the case, the Court continues to list Donahoe as the
named Defendant.

U.S.C. § 701 *et seq.* ("Rehabilitation Act").[2]  Doc. #1.  This Court has jurisdiction

pursuant to 28 U.S.C. § 1331.  Defendant has filed a renewed motion for summary

judgment.  Doc. #35.  For the reasons set forth below, his motion is SUSTAINED.


## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background

On April 6, 2011, Plaintiff sought EEO counseling with the USPS, alleging that

Virginia Carpenter ("Carpenter"), Plaintiff's second-level supervisor and, at the time,

Acting Manager of USPS's Paul Laurence Dunbar Branch in Dayton, Ohio ("Dunbar

Branch"), had engaged in race and disability discrimination.  Doc. #37-1, PAGEID #461-

62.  Plaintiff informed Carpenter of the EEO action no later than April 17, 2011.  Doc.

#37, PAGEID #434-35.[3]  On or about July 1, 2011, Plaintiff filed a formal EEO charge

with the USPS, detailing four separate incidents of alleged racial discrimination,

disability discrimination or retaliation:

> 1) On or about April 27, 2011, the Agency issued to Complainant a Notice
> of Suspension dated April 18, 2011[,] on the alleged grounds of Failure to
> Follow Instructions/Poor Performance[;]
>
> 2) On or about April 28, 2011, in order to force her from her bid position,
> the Agency issued Complainant a Notice of In-Section Bidding and
> subsequently reassigned her from her position to a less desirable position
> at the Washington Township Post Office, effective June 4, 2011[;]

---

[2] Plaintiff's disability discrimination claim was originally brought under the Americans with Disabilities Act
of 1990, 42 U.S.C. § 12101 *et seq.*  Doc. #1.  However, the Court construes her claim as though it were
brought, properly, under the Rehabilitation Act.  *Plautz v. Potter*, No. 04-6105, 156 F. App'x 812, 815-16
(6th Cir. 2005).

[3] Carpenter, in her EEO Investigative Affidavit, states that she did not become aware of any protected
activity until Plaintiff filed the formal EEO charge, which occurred on July 1, 2011.  Doc. #35-2, PAGEID
#404 ; Doc. #37-1, PAGEID #459.  However, for the purposes of this motion, the Court assumes that
Carpenter was aware of her EEO activity prior to April 18, 2011.

3) On or about April 28, 2011, the Agency placed Complainant on Emergency placement allegedly for Failure to Follow Official Instructions-Insubordination-Creating a Hostile Work Environment (Letter issued on May 2, 2011)[; and]

4) On or about May 17, 2011, the Agency issued to Complainant a Notice of Removal for Improper Conduct, effective June 24, 2011.

*Id.*, PAGEID #460.

### 1. April 27, 2011, Notice of Suspension

On April 13, 2011, Plaintiff was responsible for closing the customer service window at the Dunbar Branch. Doc. #37-1, PAGEID #493. As part of closing the customer service window, the outgoing mail received at the Dunbar Branch that day must be "dispatched," meaning that, by 6:00 p.m. each evening, the mail must be left "in the designated location for the driver," *id.*, PAGEID #497, who takes the mail to the main USPS station for distribution. Doc. #35-1, PAGEID #367. However, on the evening of April 13, 2011, two sets of mail were not left for the driver. Doc. #37-1, PAGEID #497.

On April 15, 2011, Plaintiff had a pre-disciplinary interview with Carpenter, as a result of the mail not being dispatched. In the interview, Plaintiff stated that, although she was responsible for closing the window, dispatching the mail was the responsibility of Carpenter and Lynette Downing, a Sales Service Associate at the Dunbar Branch. Doc. #35-1, PAGEID #367; Doc. #35-2, PAGEID #403; Doc. #37-1, PAGEID #493. However, Plaintiff admitted that she left the Dunbar Branch prior to the dispatch truck arriving, and that she did not make sure that all mail was dispatched prior to leaving. Doc. #37-1, PAGEID #493.

3

On April 27, 2011, Plaintiff received a Notice of Suspension, which stated that she had been suspended for seven days, effective April 18, 2011. *Id.*, PAGEID #497. Plaintiff worked and was paid during her suspension, but for progressive discipline purposes, the suspension was considered as serious of an infraction as though she had been off work without pay. *Id.*, PAGEID #497-98. Patricia Harris ("Harris"), Plaintiff's direct supervisor, issued the Notice of Suspension, stating that it was Plaintiff's "responsibility to make sure this mail gets dispatched," and that "I have considered your explanation, and I find it does not contain any merit to justify your actions. . . . You have been given prior discipline for the same offense. Your failure to follow instructions cannot continue and will not be tolerated." *Id.*

### 2. April 28, 2011, Reassignment

In early 2011, USPS closed two of its stations in the Dayton, Ohio, area. Doc. #35-1, PAGEID #383, Doc. #37, PAGEID #436. Consequently, Karen Garber ("Garber"), then-Postmaster of Dayton, Ohio, Doc. #35-1, PAGEID #382, and the postal workers' union, of which Plaintiff was a member, worked in concert to reassign employees who were working at the two stations. *Id.*, PAGEID #384. As there was only one T-7 clerk assigned to each station, Doc. 37, PAGEID #436, all T-7 clerks in the Dayton, Ohio, area, including Plaintiff, could potentially be displaced or reassigned as part of the closures.

Garber and union representatives agreed to an expedited bidding process. *Id.* Accordingly, on April 28, 2011, Garber signed and mailed bid notices to all T-7 clerks to the home address that she had on record for each clerk, including Plaintiff. The notices informed the clerks that they were to notify their supervisors of their preferred workplace

4

within five to seven days of mailing (the "bidding window"), rather than the thirty-day bidding window that had been used in prior reassignments. Doc. #35-1, PAGEID #384-85.

While Plaintiff had participated in prior bidding processes during her time as a USPS employee, those processes had never involved an expedited bidding window. Nor did the processes involve the Dayton, Ohio Postmaster General signing the bid notices. Doc. #37, PAGEID #436. Plaintiff was not in town when bid notices were mailed, and she did not receive the notice until after the bidding window had closed. *Id.*, PAGEID #436-37.

After the bidding window closed, Garber reassigned affected employees to particular branches based on their submitted bid preferences and criteria set forth in the collective bargaining agreement between the USPS and the union. Doc. #35-1, PAGEID #383-84. Ray Shank ("Shank"), a T-7 clerk with less seniority than Plaintiff, but who had submitted a timely bid, was assigned to be the T-7 clerk at the Dunbar Branch. Doc. #37, PAGEID #437. Plaintiff was reassigned to a branch in Washington Township, Montgomery County, Ohio ("Washington Township Branch"), despite Plaintiff preferring to remain at the Dunbar Branch. Doc. #35-1, PAGEID #385. The Washington Township Branch was farther away from Plaintiff's residence and was open longer hours than was the Dunbar Branch. However, Plaintiff's responsibilities, hours worked, compensation, and all other aspects of her job would have remained the same. Doc. #37, PAGEID #437. Nonetheless, before Plaintiff ever worked at the Washington Township Branch, Shank was promoted to the main USPS station, Doc #35-1, PAGEID

5

#385, and upon Shank's promotion, Plaintiff exercised her "retreat rights" to remain as the T-7 clerk at the Dunbar Branch. Doc. #37, PAGEID #437.

### 3. April 28, 2011, Emergency Placement

On April 26, 27 and 28, 2011, while on the workroom floor at the Dunbar Branch, Plaintiff made negative comments about the Dunbar Branch and about Carpenter's managerial performance, which Plaintiff perceived as deficient. Doc. #37, PAGEID #440-42. Carpenter repeatedly asked her on April 26 and 27, 2011, to stop making those comments while other employees were in earshot, but Plaintiff refused. Doc. #37-1, PAGEID #526-27. On April 28, 2011, Harris instructed Plaintiff "to work quietly and diligently," to which Plaintiff responded that "[she was] a grown person and [she] could talk if [she] wanted to." Doc. #37, PAGEID #442. Carpenter again asked Plaintiff to stop talking, at which point Plaintiff told Carpenter to "quit drinking all that gin and leave me alone," although Plaintiff did not smell alcohol on Carpenter's breath. *Id.*, PAGEID # 443; Doc. #37-1, PAGEID #530. After Plaintiff's retort, Carpenter removed Plaintiff from the workroom floor and, for the stated reasons of insubordination, creating a hostile work environment and failing to follow instructions, placed Plaintiff on emergency off-duty status until further notice. *Id.*, PAGEID #444.

### 4. May 17, 2011 Removal from Position as T-7 Clerk

After Carpenter informed Michael Mudhenk ("Mudhenk"), Customer Service Manager for the Dayton, Ohio region, that she had placed Plaintiff on emergency placement, Doc. #35-1, PAGEID #394-95, Mudhenk conducted a pre-disciplinary interview with Plaintiff, during which Plaintiff confirmed that, on April 26, 27 and 28,

6

2011, she engaged in the behavior described above. Doc. #37, PAGEID #439-44. Plaintiff expressed no remorse during the interview or at any other time after being put on emergency placement, stating, "I don't recall being remorseful about anything." *Id.*, PAGEID #444. Plaintiff remembers Mudhenk, during the interview, "being very upset, saying to me, Angela, this is nothing like what I was told. I'm going to have to give this some serious thought." *Id.*

As part of his investigation, Mudhenk spoke with Carpenter and four other USPS employees who had supervised Plaintiff at the Dunbar Branch. Mudhenk stated that all five employees reported "problems with Plaintiff, such as insubordination and failure to follow instructions," and that they "were somewhat afraid of Plaintiff and did not want to confront her." Doc. #35, PAGEID #357-58 (citing Doc. #35-1, PAGEID #394, 397).[4] From the interview and conversations with Carpenter and Plaintiff's other managers, Mudhenk concluded that Plaintiff had violated three of the policies listed in the USPS Employee and Labor Relations Manual: Obedience to Orders, Behavior and Personal Habits, and Violent and/or Threatening Behavior, Doc. #37-1, PAGEID #527-28, and decided to terminate her on those grounds, Doc. #35-1, PAGEID #396; Doc. #37-1, PAGEID #522. Carpenter signed and sent to Plaintiff a Notice of Removal on May 17, 2011, with an effective date of June 24, 2011. Doc. #37-1, PAGEID #526-28. Plaintiff did not work at any time between her April 28, 2011, emergency placement and her effective date of termination. Doc. #37, PAGEID #445.

---

[4] When confronted with Mudhenk's testimony during her deposition, Plaintiff stated that Mudhenk was lying "[t]o disprove my case." Doc. #37, PAGEID #444. However, Plaintiff offers no evidence to support her bare, conclusory allegation of perjury, and absent any such supporting evidence, the Court has no reason not to credit Mudhenk's testimony.

7

### B. Relevant Procedural History of Present Case

On or about October 31, 2013, USPS issued a final agency decision, dismissing her EEO charge. Doc. #1, PAGEID #1. Plaintiff filed the instant lawsuit in this Court on January 21, 2014. *Id.* On April 15, 2015, Defendant moved for summary judgment on all counts. Doc. #20. On March 16, 2016, the Court sustained in part with prejudice and overruled in part without prejudice Defendant's motion. Doc. #34. Count IV (Breach of Public Policy) was dismissed with prejudice in its entirety. The Court dismissed with prejudice Counts I (Racial Discrimination), II (Rehabilitation Act) and V (Retaliation or Wrongful Termination), to the extent that those claims arose under any law besides Title VII or the Rehabilitation Act, or were based on alleged denial of overtime. Also, Count II was dismissed with prejudice to the extent that it was based on Defendant's alleged failure to accommodate Plaintiff's disability. Further, the Court ordered Plaintiff to show cause as to why Count III (Hostile Work Environment) should not be dismissed for lack of subject matter jurisdiction. Finally, the Court struck Plaintiff's prayer for punitive damages. *Id.*, PAGEID #343-44.

In its entry, the Court noted that much of the evidence proffered by the parties failed to meet the admissibility and authentication standards set out in the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and this Court's Local Civil Rules. Doc. #34, PAGEID #329-333, 344 n.6. The Court indicated that Defendant could renew his motion on the remaining claims if "he submit[ted] evidence that is admissible under Fed. R. Civ. P. 56, properly authenticated under Fed. R. Evid. 901(a) and in compliance with S.D. Ohio Civ. R. 5.4(a)." *Id.* Further, the Court noted that "Plaintiff may not rely on the majority of the materials submitted by Plaintiff in her memorandum in opposition

8

to Defendant's motion, as those materials failed to meet the personal knowledge and admissible evidence requirements of Rule 56(c)(4)."  *Id.* n.6

Defendant renewed his motion—supported by evidence that met the above-listed requirements—on April 18, 2016.  Doc. #35.  Plaintiff did not file a renewed memorandum *contra*.  Nor did she request an extension of time to file such a memorandum.  After Plaintiff failed to respond to the Court's show cause order, the Court dismissed Count III with prejudice.  Doc. #38.  Accordingly, the only claims remaining before the Court are Counts I, II and V, to the extent that the legal bases and subject matter of those claims have not already been dismissed.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.265 (1986).  The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to

9

resolve the difference at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 requires the nonmoving party to go beyond the pleadings and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

"Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure Civil 3d*, 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*,

10

889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). However, if it so chooses, the court may consider other properly presented materials in the record. Fed. R. Civ. P. 56(c)(3).


### B.    Discrimination and Retaliation Claims

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The Rehabilitation Act prohibits government agencies from discriminating against their employees on the basis of a disability. 29 U.S.C. § 794(a). Plaintiff attempts to prove her race and disability discrimination claims using circumstantial evidence; such claims are analyzed under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII claims); *see also Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007) (citing *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (applying *McDonnell Douglas* burden-shifting analysis to Rehabilitation Act claims).

Under the *McDonnell Douglas* framework, a plaintiff must make an initial showing of discrimination.

> To establish a *prima facie* claim of racial discrimination under Title VII, a plaintiff must show that: 1) [s]he is a member of a protected class; 2) was qualified for the job; 3) [s]he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.

11

*Newman v. Fed, Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). A plaintiff alleging

disability discrimination under the Rehabilitation Act must make a *prima facie* showing

that she:

> 1) is disabled; 2) [is] otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004), *overruled on other grounds by*

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119

(2009). Also, element five may be met by showing that "similarly situated non-protected

employees were treated more favorably." *Jones*, 488 F.3d at 404 (citation omitted).[5]

For the adverse employment element of both Title VII and Rehabilitation Act

claims, a plaintiff must designate evidence that, as a result of a decision by the

defendant, she suffered "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524

U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (Title VII); *Plautz v. Potter*, No.

04-6105, 156 F. App'x 812, 817 (6th Cir. 2005) (quoting *Ellerth*, 524 U.S. at 761)

(Rehabilitation Act). However, "a mere inconvenience or alteration of job

responsibilities" does not constitute an adverse action. *Mitchell v. Vanderbilt Univ.*, 389

F.3d 177, 182 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876,

885 (6th Cir. 1996)).

---

[5] Additionally, "[u]nder the Rehabilitation Act, an individual who is 'regarded as' disabled counts as disabled." *Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002). An individual may be "regarded as" disabled when "a covered entity . . . hold[s] a mistaken belief that a claimant is disabled." *Id.* (citation omitted). However, this distinction is not relevant to the Court's analysis, as we assume *arguendo*, for the purpose of this motion, that Plaintiff is actually disabled.

If a plaintiff makes a *prima facie* showing under either Title VII or the Rehabilitation Act, then the burden shifts to the defendant to articulate (not to prove) a legitimate, nondiscriminatory reason for the employment decision. *Id*. at 184. If the defendant makes that modest showing, then the burden shifts back to the plaintiff to show that the defendant's proffered reason was mere pretext for its true, illegal intent. *Id*. The plaintiff's burden to show pretext can be met "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015). "[A] plaintiff need only produce enough evidence . . . to rebut, but not to disprove, the defendant's proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014).

Also, both Title VII and the Rehabilitation Act prohibit employers from retaliating against employees for engaging in protected activity. 42 U.S.C. §2000e-3(a) (Title VII); *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999) (citing 29 U.S.C. § 794(a), "the anti-retaliation provision of the Rehabilitation Act."). Retaliation claims are analyzed under a burden-shifting framework. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the defendant knew of the protected activity; (3) the defendant undertook a materially adverse employment action thereafter; and (4) but-for the plaintiff engaging in the protected activity, the defendant would not have undertaken the adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (Title VII); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Rehabilitation Act). The latter two steps in the burden-shifting framework for

retaliation claims are identical to the latter two steps for discrimination claims.
*Gribcheck*, 245 F.3d at 552. Nonetheless, for both discrimination and retaliation claims,
"[t]he ultimate burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450
U.S. at 253.

## III.  ANALYSIS

### A.  April 18, 2011 Notice of Suspension

In Counts I, II and V, Plaintiff claims that the April 18, 2011, Notice of Suspension
constituted discrimination against her due to her race and disability, and retaliation for
having engaged in protected activity. Doc. #1, ¶¶ 11, 14, 28-29, 33, PAGEID #3-6.
Plaintiff's race and disability discrimination claims (Counts I and II) arise wholly out of
the Notice of Suspension, dated April 18, 2011. Doc. #35, PAGEID # 352, 355 (citing
Doc. #37, PAGEID #436, 438).

#### 1.  Race Discrimination

In attempting to meet her *prima facie* burden, Plaintiff testified that Kathy Fiske
("Fiske") is "a white female who left express mail overnight and nothing happened to
her," and that Fiske was acting as a T-7 clerk at the Dunbar Branch when she violated
USPS policy. Doc. #37, PAGEID #430. In March, 2011, Fiske, while working as a T-7
clerk, failed to scan a priority mail piece as "Arrival at Unit." Doc. #35-2, PAGEID #406,
422. After a disciplinary investigation, Fiske was issued a Letter of Warning on March
10, 2011, for poor performance. *Id.*, PAGEID #422. Fiske's failure to properly scan a
single piece of mail differs from Plaintiff's "April 13, 2011, fail[ure] to dispatch <u>all</u>

14

collected mail, including parcels." Doc. #35, PAGEID #349 (emphasis added) (citing

Doc. #35-1, PAGEID #367; Doc. #37-1, PAGEID #497). Moreover, while there is no

evidence that Fiske had been subject to discipline prior to the issuance of her Letter of

Warning, Plaintiff had been issued a Letter of Warning on August 20, 2010, and the

previous disciplinary action against Plaintiff influenced Harris's decision to issue the

Notice of Suspension. Doc. #35-2, PAGEID #420.

The law in this Circuit is clear: for Fiske to be a comparator, she and Plaintiff

must have been "similarly-situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.2d

577, 583 (6th Cir. 1992) (emphasis in original) (citing *Stotts v. Memphis Fire Dep't*, 858

F.2d 289 (6th Cir. 1988)). "[T]he individuals with whom the plaintiff seeks to compare

his/her treatment must have . . . engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it." *Id.* Because Plaintiff and Fiske engaged in

different conduct and had different disciplinary histories, Fiske is not a valid comparator.

As Plaintiff has designated no evidence of race-based disparate treatment, she has

failed to meet her *prima facie* burden, *Newman*, 266 F.3d at 406, and Defendant's

renewed motion for summary judgment must be sustained with respect to Count I.

### 2.     Disability Discrimination

Carpenter, in her September 21, 2011, EEO Investigative Affidavit, stated that

she was unaware of Plaintiff's medical condition or impairment, Doc. #35-2, PAGEID

#404, and the parties have not cited to admissible evidence that calls into question

Carpenter's sworn statement. Nor have the parties cited to any evidence that Harris

was aware of Plaintiff's impairment. Accordingly, Plaintiff has failed to meet her *prima facie* burden to show that Defendant was aware of her disability.[6]

In her EEO charge, Plaintiff alleged that three individuals were treated more favorably than her: Fiske, Downing, and Robin Coles ("Coles"). Carpenter, in her EEO Investigative Affidavit, stated that those three employees had "no known medical condition." Doc. #35-2, PAGEID #406, 409. Fiske, as discussed *supra*, is not a valid comparator. Also, there is no evidence that Downing had any prior disciplinary history. *See* Doc. #35-2, PAGEID #406 (when asked to identify similarly situated employees at the Dunbar Branch who were issued discipline from January 15, 2010, until September 21, 2011, Carpenter listed only Coles and Fiske). As discussed above, the issuance of a Letter of Warning to Plaintiff in 2010 was one of the factors that led Harris to issue the Notice of Suspension. Thus, Downing is not similarly situated in all respects, and is not a valid comparator. *Mitchell*, 964 F.2d at 583. Finally, at no point in her deposition or memorandum in opposition to Defendant's first motion for summary judgment, does Plaintiff claim, much less designate evidence, that Coles was treated more favorably than Plaintiff. Doc. #30, 37. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, No. 13-1054, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Thus, Coles cannot be considered a comparator for the purpose of Plaintiff's *prima facie* claim.

---

[6] Plaintiff testified that she informed Carpenter that the impetus for her EEO activity was Carpenter "writ[ing] me up for my attendance, yet there was a white female clerk whose attendance was just as bad as mine because I had FMLA." Doc. #37, PAGEID #434. However, an employee may be entitled to leave under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 601 *et seq.*, "to care for the spouse, or a son, daughter, or parent, of the employee," 29 U.S.C. § 612(a)(1)(C), and not simply to deal with a personal illness. Thus, Plaintiff's statement that she was entitled to FMLA leave, without more, was insufficient to put Carpenter on notice of her disability.

As Plaintiff failed to identify any non-disabled individual who was similarly situated and treated more favorably than her, she has failed to meet her *prima facie* burden for at least one of the five elements of a disability discrimination claim. *DiCarlo*, 358 F.3d at 418. Accordingly, Defendant's renewed motion must be sustained with respect to Count II.

### 3.    Retaliation

In addition to the race and disability discrimination alleged above, Plaintiff claims that the notice of suspension was issued by Carpenter in retaliation for Plaintiff undertaking EEO activity involving Carpenter. Doc. #37, PAGEID #433-35. On April 6, 2011, Plaintiff filed sought EEO counseling, alleging that Carpenter committed race and disability discrimination, Doc. #37-1, PAGEID #460, and Plaintiff testified that she informed Carpenter of the charge after April 6, 2011, but no later than April 17, 2011. Doc. #37, PAGEID #434-35. Less than two weeks elapsed between Carpenter allegedly becoming aware of Plaintiff's EEO activity and the April 18, 2011, effective date of the adverse action. Doc. #37-1, PAGEID #462. Thus, Carpenter's "knowledge [of protected activity,] coupled with a closeness in time," could create "an inference of causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (internal quotation and citation omitted).

However, it was Harris, not Carpenter, who signed off on the Notice of Suspension, and there is no evidence that Harris had any knowledge of Plaintiff's EEO activity. Absent knowledge of protected activity, Plaintiff cannot sustain a retaliation claim. *Laster*, 746 F.3d at 730; *Gribcheck*, 245 F.3d at 550. Even if the Court were to accept Plaintiff's contention that Harris was acting as a conduit for Carpenter's

17

retaliatory intent, *i.e.*, a "cat's paw" theory, *see Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677-78 (6th Cir. 2008), and thus impute Carpenter's knowledge to Harris, Plaintiff's claim would still fail. Defendant has put forth evidence that Plaintiff received the Notice of Suspension after it was determined that she had not correctly dispatched the mail, and after having previously received a Letter of Warning. Doc. #37-1, PAGEID #497-98. As Plaintiff does not contend that those proffered reasons are facially illegitimate, Defendant met his modest burden under *McDonnell Douglass*. *Gribcheck*, 245 F.3d at 552. Accordingly, the burden shifts back to Plaintiff to show that the facially legitimate action was pretext for Carpenter's true retaliatory motivation. *Id*. Plaintiff has designated no evidence to rebut Defendant's proffered rationale, *Shazor*, 744 F.3d at 957, and, consequently, her retaliation claim (Count V) fails to the extent that it is based on the April 18, 2011, Notice of Suspension.

### B. Plaintiff Cannot Sustain Claim of Retaliation with Respect to any other Adverse Action

#### 1. Reassignment to Washington Township Branch

Plaintiff claims that the reassignment to the Washington Township Branch via the expedited bidding process was retaliation by Garber for Plaintiff's previous EEO activity involving Carpenter. Doc. #37, PAGEID #435-36. Plaintiff admits that she never filed an EEO charge involving conduct by Graber, *id.*, and there is no evidence that Garber knew of her April 6, 2011, EEO counseling. Garber "had known in 2010 of a prior EEO Complaint[] . . . as it was referenced in a file that was kept of the many letters [Plaintiff] sent to the postmasters over the years." Doc. #37-1, PAGEID #462. However, even if Garber became aware of Plaintiff's previous protected activity on December 31, 2010,

18

such knowledge would have preceded the institution of the expedited bidding window and subsequent reassignment of Plaintiff by more than four months. The Sixth Circuit has consistently held that, without additional evidence linking: (a) the employee's protected activity; (b) the employer's knowledge; and (c) the adverse action, the mere fact that an adverse employment action took place "four months after filing a discrimination claim is insufficient to support an interference [*sic*] of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (quoting *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (brackets in original)).

Moreover, the reassignment to the Washington Township Branch was not an adverse action. As discussed above, the only difference between working at the Washington Township Branch versus the Dunbar Branch would have been the length of her commute and the hours of the day in which she worked. Doc. #37, PAGEID #437. Even assuming that a longer commute and less convenient hours could constitute adverse actions, *Ellerth*, 524 U.S. at 761, it is undisputed that she never worked at the Washington Township Branch, and, thus, suffered no harm from the reassignment. Accordingly, Plaintiff has failed to meet her *prima facie* retaliation burden, and to the extent her retaliation claim (Count V) arises from her reassignment, it cannot be sustained.

## 2. Emergency Placement and Notice of Removal

Plaintiff claims that Carpenter was responsible for putting her on emergency placement on April 28, 2011, and issuing the Notice of Removal on May 17, 2011, in retaliation for her April, 2011, EEO activity. Doc. #37, PAGEID #438. It is undisputed that Carpenter put Plaintiff on emergency placement. Doc. #35-1, PAGEID #395; Doc.

#35-2, PAGEID #408.  However, while the Notice of Removal was signed by Carpenter, the decision to terminate Plaintiff was made by Mudhenk.  *Id.*, PAGEID #396; Doc. #37-1, PAGEID #528.

Plaintiff's April 6, 2011, EEO activity did not involve Mudhenk, Doc. #37, PAGEID #438-39, and there is no evidence that Mudhenk was aware of Plaintiff's prior protected activity.  Thus, Plaintiff has not met the "knowledge of protected activity" element of her *prima facie* burden for the Notice of Removal.  *Gribcheck*, 245 F.3d at 550.

Moreover, even if Carpenter's knowledge of Plaintiff's prior activity could be imputed to Mudhenk, *Madden*, 549 F.3d at 677-78, for purposes of meeting her *prima facie* burden, her retaliation claim would still fail for both the emergency placement and Notice of Removal.  It is undisputed that Carpenter, as Dunbar Branch Manager, was empowered to put employees on emergency placement, and Mudhenk testified that, "after reviewing all of the information and conducting the [pre-disciplinary interview]," it was within his discretion to issue the Notice of Removal to Plaintiff.  Doc. #35-1, PAGEID #396.  Carpenter's decision to put Plaintiff on emergency placement came only after repeatedly asking Plaintiff over a three-day period to stop making negative comments while on the workroom floor.  As discussed above, Plaintiff refused to honor Carpenter's requests, instead telling Carpenter "to quit drinking all that gin I smelled on her and to leave me alone."  Doc. #35, PAGEID #357 (citing Doc. #37, PAGEID #439-40, 442-43; Doc. #37-1, PAGEID #530).  Similarly, Mudhenk's decision to terminate Plaintiff was made only after interviewing Plaintiff, who confirmed that she had made the negative comments on the workroom floor, and five of Plaintiff's former supervisors, all of whom stated that Plaintiff was insubordinate and difficult to work with.  Doc. #35-1,

PAGEID #394, 396; Doc. #37, PAGEID #444. In sum, the emergency placement and Notice of Removal were facially legitimate actions, and, thus, Defendant has met his modest burden in the second stage of the *McDonnell Douglas* analysis. *Gribcheck*, 245 F.3d at 252.

Plaintiff has produced no evidence to rebut Defendant's proffered rationales for the adverse actions, as she must do to avoid summary judgment. *Id.* Plaintiff has offered no evidence that the stated reasons were factually baseless or did not actually motivate Defendant. Plaintiff's conclusory testimony that she believed that the actions were taken in retaliation for her EEO activity, Doc. #37, PAGEID #438, was "unadorned with supporting facts," and, thus, is "insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

Moreover, any attempt by Plaintiff to show that the stated reasons were insufficient to motivate the decisions would be futile. In her deposition, Plaintiff claimed that "never on earth could you emergency place me because I didn't do anything worthy of being fired over." Doc. #37, PAGEID #443. However, she offers no evidence that Carpenter or Mudhenk's discretionary authority was limited in response to conduct similar or identical to that of Plaintiff.[7] Absent any evidence that Carpenter or Mudhenk acted outside of their respective authorities in issuing the emergency placement or Notice of Removal, "[i]t is not within the province of the courts to . . . 'act as super personnel departments to second guess an employer's facially legitimate business

---

[7] Plainitff, in her initial memorandum *contra*, quoted a section of the union contract regarding emergency placement procedures, and claimed that her behavior "did not fall within the stated reasons for such a placement." Doc. #30, PAGEID #293. However, Plaintiff did not attach the union contract. Nor is there a copy elsewhere in the record. Thus, the Court may not consider Plaintiff's argument.

decisions.'" *Lee v. City of Columbus*, 636 F.3d 245, 257-58 (6th Cir. 2011) (quoting *Adams v. Tennessee Dep't of Fin. & Admin.*, No. 04-5718, 179 F. App'x 266, 272 (6th Cir. 2006)). As Plaintiff has failed to meet her evidentiary burden for any alleged adverse action, Defendant is entitled to summary judgment on Count V in its entirety.

## IV. CONCLUSION

For the foregoing reasons, Defendant's renewed motion for summary judgment, Doc. #35, is SUSTAINED, and judgment shall enter in favor of Defendant and against Plaintiff with respect to Counts I, II and V. Also, pursuant to the Court's earlier entries and orders, Doc. #34, 38, judgment shall enter in favor of Defendant and against Plaintiff with respect to Counts III and IV.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: July 1, 2016

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

22